IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN P. LENARZ, | ) | CASE NO. 5:12CV01542 |
| | ) | JUDGE JAMES S. GWIN |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KATHLEEN B. BURKE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brian P. Lenarz ("Plaintiff" or "Lenarz") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act) and Supplemental Security Income ("SSI") under Title XVI of the Act.  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) of the Act.  This matter has been referred to

the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).  For the following reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED.**

## I.  Procedural History

On January 10 and January 15, 2008, Plaintiff filed applications for DIB and SSI,

respectively, alleging a disability onset date of October 15, 2007. Tr. 41, 70-71, 117.  Plaintiff

alleged he was disabled due to a combination of diabetes mellitus and vision problems. Tr. 70-

74, 77, 81, 83.  Plaintiff's applications were denied initially (Tr. 70-79) and on reconsideration

(Tr. 81-85).  Thereafter, he requested a hearing before an administrative law judge.  Tr. 86-87.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)
of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

On October 25, 2010, Administrative Law Judge Edmond Round (the "ALJ") conducted a

hearing. Tr. 31-69.  On January 13, 2011, the ALJ issued a decision, finding that Plaintiff was

not disabled.  Tr. 12-25.  Plaintiff requested a review of the ALJ's decision by the Appeals

Council on February 10, 2011.  Tr. 7-8.  On April 20, 2012, the Appeals Council denied review,

making the ALJ's decision final.  Tr. 1-3.

## II.  Evidence

### A.  Personal and Vocational Evidence

Plaintiff was born on November 6, 1969, and was 37 years old on the alleged disability

onset date. Tr. 93, 96.  He is unmarried and has no children.  Tr. 231.  Although his main

occupation has been as a hairdresser, Plaintiff's other jobs include: (1) manager of a furniture

store, (2) manager of a grocery store, (3) manager and customer service representative of a meat

packing store, (4) assistant manager of a video store, and  (5) associate at a surplus store.  Tr. 39-

41, 146-55.

### B.  Medical Evidence

Lenarz's medical history shows that he has received treatment for many different medical

conditions, including: hypertension (Tr. 200, 228, 327-28, 331, 336), pancreatitis (Tr. 200, 323-

24), hepatitis B (Tr. 333, 339, 343-45), respiratory infection (Tr. 236, 239), otitis media (Tr.

235), dyslipidemia (Tr. 336), alcohol and cannabis abuse (Tr. 203, 300, 402),  and bipolar I

disorder[2] (Tr. 372, 396, 406).  However, his chief arguments as to why the ALJ erred in

---

[2] On December 29, 2009, Dr. Chughtai of Trillium Family Solutions, diagnosed Lenarz with bipolar I disorder, obsessive compulsive personality disorder and alcohol and cocaine dependence and gave Lenarz a Global Assessment of Functioning score ("GAF") of 60.  Tr. 372.  GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  Lenarz went to Trillium Family Solutions from February 28, 2010 to October 21, 2010 for progress check-ups.  Tr. 350-58, 408-16.  Lenarz's last medical record shows he was admitted to the Aultman Health Foundation emergency room on

concluding that he was not disabled relate to his alleged extreme fatigue caused by his insulin-dependent diabetes mellitus and HIV infection.  Therefore, the evidence discussed below primarily consists of medical records regarding his insulin-dependent diabetes mellitus and HIV. The medical records discussed below include medical evidence from the Aultman Health Foundation emergency room, the Aultman Physician Center, Trillium Family Solutions and Clinicians in Infectious Diseases, Inc.

### 1.  Medical evidence relating to insulin-dependent diabetes mellitus

Lenarz followed up with his family doctor, Dr. Fiorentino, from the Aultman Physician Center, on March 2, 2006, after an emergency room visit about two weeks prior.  Tr. 236. Lenarz blamed the clinic for his not having insulin, which was the precipitating event for his emergency room visit.  Tr. 236.  He claimed that the clinic did not have samples and did not do his paperwork correctly.  Tr. 236.  However, Dr. Fiorentino noted that the records showed that the paperwork was complete.  Tr. 236.  Dr. Fiorentino concluded that Lenarz's hypoglycemia and respiratory infection had resolved and she increased his medicine dosage on a sliding scale. Tr. 236.

Lenarz saw Dr. Fiorentino again on July 6, 2006.  Tr. 235.  She stated that he was not taking one of his medications because he believed it led to weight gain.  Tr. 235.  Lenarz reported that his blood sugar was "erratic."  Tr. 235.  Lenarz said he was exercising and jogging regularly.  Tr. 235.  The jogging was helping with his stress levels but it did not help with his

---

September 15, 2010, because of suicidal ideation.  Tr. 401.  Dr. Snavely assessed Lenarz with bipolar disorder, not otherwise specified, and polysubstance dependence and gave him a GAF score of 30.  Tr. 406.  A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  Upon discharge, Dr. Snavely diagnosed Lenarz with bipolar disorder, mixed mood state, polysepsis dependence, gave him a GAF score of 55 and stated that he was at low risk of self-harm.  Tr. 396-97.

blood sugar.  Tr. 235.  Dr. Fiorentino advised him to do laboratory tests and keep track of his blood sugar.  Tr. 235.

On October 26, 2006, Lenarz went for a check-up with Dr. Alabbas, from the Aultman Physician Center.  Tr. 233.  Lenarz denied any problems, except for the fact that he had not been able to control his blood sugar since he was put on insulin.  Tr. 233.  Dr. Alabbas stated that Lenarz had not kept his appointment for his scheduled blood work.  Tr. 233.  The doctor advised Lenarz to follow up with an eye doctor, which he had not done because of financial troubles.  Tr. 233.  Dr. Alabbas concluded that Lenarz could not control his blood sugar because he was not taking his insulin the right way.  Tr. 233-234.  He advised Lenarz to check his blood sugar three times a day for the next two weeks and to forward the results to the doctor for review.  Tr. 233-34.  He also scheduled Lenarz for a class at the Clinic.  Tr. 233-234.

On May 30, 2007, Lenarz had a follow-up with Dr. Shukla from the Aultman Physician Center, who stated that Lenarz has a history of uncontrolled diabetes mellitus type II and he has been noncompliant in the past. Tr. 231.  Lenarz said that he did not know how much insulin he was taking and that no one educated him on how to take insulin.  Tr. 231.  He also said that he was not eating much breakfast or lunch but he was exercising.  Tr. 231.  Dr. Shukla diagnosed Lenarz with uncontrolled type II diabetes, diabetic nephropathy, elevated total protein globulin and anemia.  Tr. 232.  The doctor also educated Lenarz about insulin and how to take it and advised him to keep track of his blood sugar very meticulously.  Tr. 231-32.

Lenarz saw Dr. Shukla again on October 3, 2007.  Tr. 229.  Dr. Shukla's adjustments to Lenarz's medications had worked well as Lenarz had not had any occurrences of hypoglycemia.  Tr. 229.  Lenarz was still not keeping track of his blood sugar because he was out of test strips due to lack of money.  Tr.  229.  He also had a respiratory infection three weeks prior to this

office visit but the issue had almost completely resolved.  Tr. 229.  Dr. Shukla ordered that

Lenarz be enrolled in training and education programs about diabetes that would entitle him to a

free glucometer and test strips.  Tr. 229.  Dr. Shukla again reminded him about the dangers of

diabetes and how important it was to keep track of blood sugar levels; he advised Lenarz to

check his blood sugar levels three to four times a day for the time being, and then less frequently.

Tr. 229.  The doctor also diagnosed him with protenuria and ordered some new laboratory tests.

Tr. 229.

On January 9, 2008, Lenarz had a follow-up with Dr. Shukla.  Tr. 227.  Dr. Shukla again

said that Lenarz had been "very noncompliant" in the past with respect to his diabetes.  Tr. 227.

Although Dr. Shukla had enrolled Lenarz in a program where he could get free test strips for his

blood sugar, Lenarz still had not been checking his blood sugar regularly.  Tr. 227.  Dr. Shukla

also stated that Lenarz did not have a daily routine as he missed lunch and dinner and sometimes

breakfast and he sleeps fourteen to sixteen hours a day.  Tr. 227.  Lenarz told Dr. Shukla that, on

a couple of occasions, the way he found out his blood sugar was low was when the paramedics

came.  Tr. 227.  Dr. Shukla had a lengthy talk with Lenarz about how he should have a daily

routine, not miss meals, check his blood sugar regularly, and also educated him on how insulin

works.  Tr. 227.  The doctor again advised him of the dangers of not controlling his diabetes.

Tr. 227.  Lenarz said he would try to control his diabetes better.  Tr. 227.  Lastly, the doctor

noted what could be diabetic retinopathy and advised Lenarz to see an ophthalmologist.  Tr. 228.

On April 9, 2008, Lenarz visited Dr. Shukla again.  Tr. 330-31.  Dr. Shukla stated that,

although Lenarz had a history of noncompliance, the repeated education and training has done

him good and he is now more compliant.  Tr. 331.  Lenarz said he still did not have a set time for

his meals nor a daily routine and, thus, Dr. Shukla again stressed that it was very important to

follow a routine so he can better manage his blood sugar.  Tr. 331.  Lenarz did have some blurred vision in his right eye but he had made an appointment with an ophthalmologist to get this checked out.  Tr. 331.  Dr. Shukla concluded that Lenarz's diabetes type II and his protenuria were better controlled than before.  Tr. 331.  However, the doctor did adjust his diabetes medication.  Tr. 331.

Lenarz went for a consultative eye exam at Canton Opthalmology with Dr. Barchesi on June 26, 2008 due to concerns about diabetic retinopathy.  Tr. 280-81.  Dr. Barchesi found no abnormalities in Lenarz's eyes and determined that his eyes would be 20/20 on each side with corrective lenses.  Tr. 280.

Lenarz had a follow up with Dr. Abou-Rjeily at the Aultman Physician's Center on August 7, 2008.  Tr. 328-29.  Following the examination, Dr. Abou-Rjeily concluded that Lenarz's diabetes type II was better controlled than before, the protenuria was better than before, the hypertension was controlled with his medication, he had no diabetic retinopathy, and his anemia is a "questionable chronic disease."  Tr. 328-29.

On October 4, 2008, Lenarz was admitted to the Aultman Health Foundation emergency room complaining of chest pain, shortness of breath, cough with sputum production, rinorrhea, nasal congestion, decreased appetite and vomiting.  Tr. 313-14.  On October 14, 2008, Lenarz was discharged to Arbors Nursing Home for rehabilitation and he spent two weeks there.  Tr. 313, 326.  His final diagnoses included diabetic ketoacidosis, shortness of breath, metabolic acidosis with increased anion gap, acute renal failure, hyperkalemia, hypernatremia, HIV, tricyclic antidepressant overdose, sepsis and right upper extremity cellulitis.  Tr. 313.  He was advised to follow up with Clinicians in Infectious Diseases, Inc. ("CID") in four weeks because of his HIV infection.  Tr. 314.

Lenarz visited his family physician Dr. Abou-Rjeily at the Aultman Physician Center on January 8, 2009.  Tr. 326.  Dr. Abou-Rjeily said that his diabetes type II was "apparently controlled."  Tr. 327.  Lenarz had a routine check-up with Dr. Abou-Rjeily on May 21, 2009.  Tr. 339.  The doctor again said that Lenarz's diabetes was under control.  Tr. 339.  On October 8, 2009, Lenarz had another routine visit with Dr. Abou-Rjeily.  Tr. 336.  Dr. Abou-Rjeily said that Lenarz had no complaints and had been "very compliant to his treatment" in regard to the diabetes mellitus type II.  Tr. 336.

On November 19, 2009, Lenarz had a routine check-up with Dr. Abou-Rjeily.  Tr. 348. This time, his blood sugar was uncontrolled because he had not been taking his insulin.  Tr. 348. Lenarz said he was not taking insulin regularly because his insurance would not cover it.  Tr. 348.  Lenarz had another routine check-up with Dr. Abou-Rjeily on May 20, 2010.  Tr. 375. Based on Lenarz's blood sugar monitoring data, his blood sugar was mainly high in the morning although he had been taking his insulin.  Tr. 375.  Thus, Dr. Abou-Rjeily adjusted his medication dosages.  Tr. 376.

In addition to Lenarz's check-ups and follow-ups with his family physicians, on numerous occasions, he was seen at the Aultman emergency room when his diabetes symptoms flared due to his noncompliance with his doctors' instructions and/or low blood sugar.  This happened on the following dates: February 20, 2006 (Tr. 237-39, 271-76),[3] February 11-13, 2008 (Tr. 267-70, 303-07),[4] May 30 – June 2, 2008 (Tr. 291-301)[5] and July 31, 2008 (Tr. 290).[6]

---

[3] Lenarz stated that he had not been taking his insulin since October 2005 because he ran out of medication.  Tr. 276. The record of this visit also shows that Lenarz was diagnosed with diabetes about four and a half years prior to this visit.  Tr. 276.

[4] The attending physician noted that Lenarz was at the emergency room because he had been noncompliant with his diabetes medication.  Tr. 269.  During his stay, Lenarz received education and compliance training and the doctor told him to follow a diabetic diet, check his blood sugars regularly, exercise and avoid smoking tobacco, doing drugs and drinking alcohol.  Tr. 305.

[5] This emergency room visit was again precipitated by Lenarz's noncompliance with his diabetes medication.  Tr. 301.

During a January 12, 2010, visit to CID, it was noted that Lenarz was receiving insulin for his diabetes and doing well.  Tr. 343.

### 2.   Medical evidence relating to the HIV infection

Following his HIV diagnosis in October 14, 2008 (Tr. 313) while at the Aultman Health Foundation, Lenarz visited CID for his HIV infection as directed on November 18, 2008.  Tr. 333.  He had been taking Altripla up until three days before this visit but had run out of medication because he did not have insurance.  Tr. 333.  Overall, Lenarz was doing well and he was much improved.  Tr. 333.  CID referred him to Trillium, an agency that would help him get medications.  Tr. 333.

On January 13, 2009, Lenarz followed up with CID.  Tr. 333.  They said that Lenarz was taking his medications "religiously."  Tr. 333.  His CD4[7] count was 191 and his viral load[8] had reduced from 1,388,582 to less than 48.  Tr. 333.  Also, Lenarz had "improved significantly" and had gained about twenty pounds.  Tr. 333.  On April 14, 2009, Lenarz went to CID again.  Tr. 345.  Again, they said that he was doing well, taking his medicine on a daily basis and had some weight gain.  Tr. 345.  His CD4 count was 222 and his viral load was again less than 48.  Tr. 345. Lenarz followed up with CID on July 14, 2009.  Tr. 345.  They said that his exam was "benign," he had no new complaints, his CD4 was 219 and his viral load was again less than 48.  Tr. 345.

On October 13, 2009, Lenarz had another follow-up with CID.  Tr. 344.  They said Lenarz was compliant and had no new side effects.  Tr. 344.  Also, he had gained about forty pounds in the past year.  Tr. 344.  His CD4 was again 256 and his viral load was again less than

---

[6] Lenarz was admitted to the emergency room on this date because of low blood sugar.  Tr. 290.  He was released on the same day after he received an IV insulin drip.  Tr. 290.

[7] CD4 is a classification of T lymphocytes cells and refers to those that carry the CD4 antigens; most are called helper cells. *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 319.

[8] Viral load is the level of the HIV virus in one's blood stream.  The goal of treatment is to reduce the viral load to "undetectable levels," which is between 40-75.  *See Viral Load*, http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load (last updated Aug. 6, 2009).

48.  Tr. 344.  His liver enzymes, kidney function, hepatitis profile and lipids profile were within normal limits.  Tr. 344.  Lenarz was advised to follow his current therapy.  Tr. 344.

On January 12, 2010, Lenarz had his regular follow-up with CID.  Tr. 343.  Other than occasional feelings of nasal congestion, Lenarz did not report any problems.  Tr. 343.  His HIV was under control and he had been compliant with his HIV medications.  Tr. 343.  His CD4 count was 200 and his viral load was again less than 48.  Tr. 343.  CID noted that Lenarz's virologic and immunological response would be closely monitored because there had been fluctuations in his CD4 count.  Tr. 343.

Lenarz had another follow-up with CID on April 13, 2010.  Tr. 379.  He had been compliant with medications and he had been gaining weight.  Tr. 379.  His CD4 count was 290 and his viral load was less than 48.  Tr. 379.  His doctor continued him on Altripla and multivitamins but, discontinued the Bactrim.  Tr. 379.  His doctor also discussed with Lenarz the importance of exercise, healthy diet and safe sexual practices.  Tr. 379.

On July 13, 2010, Lenarz visited CID for a follow-up.  Tr. 378.  Lenarz showed good compliance, no side effects, his CD4 was 331 and his viral load was less than 48.  Tr. 378.  His creatinine levels were mildly elevated which, according to the physician, might be due his HIV, hypertension medication and/or the Bactrim medication.  Tr. 378.

During the time that CID was treating Lenarz, Dr. About-Rjeily, Lenarz's family physician, was also treating Lenarz and noted that he was compliant with his HIV medications and he was doing well.  Tr.  326, 336, 348.

## C.  Administrative Hearing

### 1.  Lenarz's Testimony

Plaintiff appeared with counsel, Steven Stocker, on October 25, 2010, and testified before the ALJ.  Tr. 31-69.  Lenarz testified that he lives in an apartment above his mother's home because he needs help with his medical problems and she helps him get to the doctor and get his medications.  Tr. 37-38.  Lenarz has not driven for over thirteen years because he has seizures.  Tr. 38.  He also admitted that he has had a problem with drug and alcohol abuse but stated that he has been clean for over five years.  Tr. 38.  Lenarz described his past jobs and stated that he cannot perform his past work because of his bipolar disorder.  Tr. 39-41.  He stated that he feels "barbaric" and he wants to "rip [people's] faces off."  Tr. 41.  Further, he testified that, around the time of his alleged disability onset date of October 2007, he lost his job because of an inability to control seizures that were related to his diabetes.  Tr. 41.  He indicated that he started having seizures after he was diagnosed with diabetes, about thirteen years ago, and his seizures are related to his sugar levels.  Tr. 41-43.  When he lost his job in 2007, he was having seizures once or twice every couple of weeks but now his seizures were occurring less frequently.  Tr. 43.  He stated that he has no forewarning regarding when a seizure may occur and, thus, paramedics have been to his house a "minimum of twenty times."  Tr. 43.  He stated that he was now checking his blood sugar regularly.  Tr. 43.  He checks his blood sugar seven to eight times a day, and sometimes fifteen times a day, in order to try to control it.  Tr. 43-44.

Lenarz also testified that he considers it an activity just to get out of bed and clean his bathroom whereas, before, he used to run ten to twelve miles a day.  Tr. 44-45.  A typical day for him now is checking sugar levels, taking his medications and sleeping.  Tr. 51.  In fact, when he does go out of the house, it is usually when people take him to the doctor.  Tr. 45.

Lenarz stated that he cannot be anywhere around people because of his bipolar disorder.  Tr. 45.  In fact, he testified that he has lost all of his past jobs because of anger issues.  Tr. 46-47.

10

He stated his depression worsened following his HIV diagnosis.  Tr. 47.  He also said his manic episodes last for weeks, sometimes months, and he has trouble sleeping.  Tr. 49.  Also, he stated that he has switched bipolar medications six to seven times since his diagnosis.  Tr. 49.  For example, Seroquel made him depressed to the point that he wanted to commit suicide while Zyprexia gave him an extreme allergic reaction.  Tr. 50-51.

Lenarz's HIV diagnosis has caused him problems too.  He said he cannot work anywhere where he can get cut because of the risk of HIV exposure.  Tr. 51-52.  He stated that he avoids people because of the risk of exposure.  Tr. 52.  Altripla, his HIV medication, is causing him problems with his "cognitive thinking" and giving him depression.  Tr. 52-53.

### 2.  Vocational Expert's Testimony

Carol Mosley (the "VE") appeared at the hearing and testified as a vocational expert.  Tr. 54-67.  She testified that Lenarz previously worked as a manager and in customer service at a meat packing store (DOT[9] number 18716716; a SVP 7[10] position at the light exertional level), an assistant manager at a video store (DOT number 209562010; a SVP 3 position at the light exertional level) and a hairstylist (DOT number 332271010; a SVP 6 position at the light exertional level).  Tr. 57-58.  The ALJ asked the VE whether a hypothetical worker can do any of Lenarz's past relevant work if he: (1) is limited to standing or walking only six hours in each eight hour day, (2) is limited to lifting, pushing, carrying or pulling ten pounds frequently or twenty pounds occasionally, (3) must avoid environments where he could get cut and, (3) must work in a low-stress environment with only superficial interaction with supervisors, coworkers and the public; he cannot do tasks that require arbitration, negotiation, confrontation, directly

---

[9] The Dictionary of Occupational Titles is published by the Department of Labor.  *See* 20 CFR § 404.1566(d)(1).

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).  Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

working with others or being responsible for the safety of others.  Tr. 58-59.  The VE stated that this hypothetical worker could not do any of Lenarz's past relevant work.  Tr. 59.

The ALJ then asked the VE if there are any jobs in the national economy this same hypothetical worker can do, assuming the same age, work experience and education as Lenarz. Tr. 59-60.  The VE testified that jobs existed in significant numbers in the national economy that the hypothetical worker could perform, all unskilled, including: (1) a cleaner (DOT number 323687018; in excess of 250,000 jobs nationally and 2,500 jobs statewide in Ohio), (2) a packer (DOT number 920587018; in excess of 350,000 jobs nationally and 3,500 jobs statewide in Ohio), and, (3) an inspection worker (DOT number 559687074; in excess of 200,000 jobs nationally and 2,000 jobs statewide in Ohio).  Tr. 60-61.  On cross-examination, the VE testified that, if Lenarz were absent every couple of weeks from work, an employer likely would not find such absences tolerable.  Tr. 62.  Also, the VE testified that, if he was off task only ten percent of the time, it likely would cause no problems because an average employee is off task about ten percent of the time.  Tr. 62-63.  She also stated that an employer would not tolerate rest periods outside of normal breaks or lunch breaks and that it would be unacceptable in most jobs for an employee to go to the bathroom every hour.[11]  Tr. 63-64.  Lenarz's attorney also attempted to ask the VE whether there were jobs meeting the ALJ's "superficial interaction" hypothetical that would also allow the worker to be in close enough proximity to other workers in case a seizure occurs and there is a need to call for medical assistance.  Tr. 64-68.  The VE indicated that she did not fully comprehend the hypothetical and, ultimately, she could not provide a clear response.  Tr. 68.

---

[11] However, the VE did testify that this would not cause a problem if he worked as a cleaner.  Tr. 64.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

The ALJ determined that Lenarz met the insured status requirements of the Act through December 31, 2012.  Tr. 15, 17.  At Step One of the sequential analysis, the ALJ concluded that Lenarz had not engaged in substantial gainful activity since October 15, 2007, the alleged disability onset date.  Tr. 17.  At Step Two, the ALJ determined that Lenarz had the following severe impairments: diabetes mellitus, bipolar disorder, and episodic alcohol and cannabis abuse. Tr. 18-19.  At Step Three, he found that Lenarz did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[12]  Tr. 19-20.  The ALJ then determined Lenarz's RFC and found that he could perform light work with the following limitations:

> [H]e can lift, carry, push and/or pull 10 pounds frequently and 20 pounds occasionally and can sit, stand and/or walk for 6 hours in each 8 hour day with normal breaks.  He is precluded from working in any environment in which he could suffer a cut or laceration from a sharp instrument (like a saw or knife).  He is limited to low-stress tasks that involve no more than superficial interaction with supervisors, coworkers and the public.  He is precluded from tasks involving arbitration, negotiation, confrontation, the need to direct the work of others, or the need to be responsible for the safety of others.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

Tr. 20-23 (internal citations omitted).[13]  At Step Four, the ALJ concluded that Lenarz could not perform his past relevant work.  Tr. 23.  At Step Five of the analysis, the ALJ found that there are jobs that exist in significant numbers in the national economy that Lenarz can perform.  Tr. 23-24.  Therefore, the ALJ concluded that Lenarz was not disabled.  Tr. 24.

## V.  Arguments of the Parties

Plaintiff objects to the ALJ's decision on two grounds.  First, he argues that the ALJ erred at Step Two of the sequential analysis because he failed to find his HIV infection to be a severe impairment.  Doc. 14, pp. 7-8.  Lenarz's second argument is that the ALJ did not properly evaluate his credibility.  Doc. 14, pp. 8-9.

On the other hand, the Commissioner asserts that substantial evidence supports the ALJ's decision.  Doc. 15, p. 7.  Specifically, the Commissioner argues that the ALJ's Step Two analysis should not be disturbed because the existence of an impairment does not reveal the extent to which it limits Lenarz's ability to work and because the ALJ discussed and considered all of Lenarz's impairments in the remaining steps.  Doc. 15, p. 8.  The Commissioner also argues that the ALJ properly assessed Lenarz's credibility because Lenarz did not point to any evidence to support his subjective complaints.  Doc. 15, p. 10.

## VI.  Law and Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

---

[13] The ALJ determined that Lenarz could not work near sharp objects because of his HIV infection, even though he did not consider it to be a severe impairment.  Tr. 23.

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Srvs.*, 889 F.2d 679, 681 (6th Cir. 1989) (*per curiam*).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B. The ALJ did not commit reversible error at Step Two in finding that Plaintiff's HIV was not a severe impairment

Lenarz contends that the ALJ erred at Step Two of the sequential analysis by failing to include his HIV as a severe impairment.  Doc. 14, pp. 7-8.  A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c).  The claimant has the burden at Step Two to establish that he "suffers from a severe medically determinable physical or mental impairment." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); *see* 20 C.F.R. § 404.1520(a)(4)(ii).  The severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *see Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985) "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects

work ability regardless of age, education and experience." *Higgs,* 880 F2d. at 862; *see Farris,* 773 F. 2d at 90.

Lenarz argues that his HIV infection had more than a minimal effect on his ability to work as it caused him severe fatigue.  However, Lenarz fails to point to records that support his alleged severe fatigue.  Further, for the following reasons, Lenarz's argument is misguided.  At Step Two, the claimant has the burden to prove that at least one of the claimant's impairments is severe.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190 (6th Cir. 2009); *see also Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 529 (6th Cir. 1997).  If the ALJ finds that at least one of the claimant's impairments is severe, the ALJ must consider *both* the severe and non-severe impairments in the remaining steps.  *See Simpson,* 344 F. App'x at 190 (citing *Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. 2008)).  "In other words, '[o]nce *one* severe impairment is found, the combined effect of *all* impairments must be considered, even if other impairments would not be severe.' " *Id.* (emphasis supplied) (quoting *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787 (6th Cir. 2009)).  Therefore, the Sixth Circuit has explained that it is "legally irrelevant" that some of a claimant's impairments were considered non-severe if others were found to be severe so long as the ALJ considered both the severe and non-severe impairments in the remaining steps.  *Id.*; *see also Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ concluded that Lenarz's HIV was not a severe impairment because the HIV was being "adequately managed" with antiretroviral medication and because there was no evidence of any "sequelae" that would affect Lenarz's workplace functioning.  Tr. 18.  This finding is supported by the record.  For example, the CID consistently found that Lenarz was doing well and improving with his HIV infection.  Tr. 333, 343-44, 378-79.

The Court need not reach the question whether the ALJ erred in failing to find Lenarz's HIV infection to be a severe impairment because, even if the ALJ's determination was erroneous, the error would not warrant a reversal.  At Step Two of the analysis, the ALJ determined that Lenarz had the following severe impairments: diabetes mellitus, bipolar disorder, and episodic alcohol and cannabis abuse.  Tr. 18-19.  He then proceeded to review Plaintiff's claim through Step Five of the sequential process.  The ALJ specifically addressed both Plaintiff's HIV infection and the impairments found to be severe in his RFC analysis.  Tr. 23.  For example, the ALJ specifically included in his RFC determination the limitation that Lenarz could not work near sharp objects because of his HIV diagnosis. Tr. 23.  Moreover, the ALJ expressly accounted for Lenarz's complaints of fatigue by limiting him to light work.  Tr. 22.  Accordingly, the ALJ's failure to find Lenarz's HIV infection to be a severe impairment would not warrant reversal even if it were an error. *See Maziarz*, 837 F.2d at 244 (failure of Secretary to find that an impairment was severe was not reversible error because he found that claimant had other severe impairments); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 20)03) ("Because the ALJ found that Pompa had a severe impairment at Step Two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").

**C.  The ALJ properly evaluated Plaintiff's credibility**

Plaintiff argues that the ALJ did not properly evaluate his credibility because the ALJ did not cite to anything specific that would discount Lenarz's complaints of fatigue and muscoskeletal pain, symptoms that could be explained by his HIV infection and diabetes.  Doc. 14, pp. 8-9.  As is clear in his decision, the ALJ accounted for Lenarz's complaints of fatigue and muscoskeletal pain.  Tr. 22.  More particularly, the ALJ stated "[i]n concluding that Lenarz is

18

limited to light work, I considered his allegations of fatigue and diffuse muscoskeletal complaints." Tr. 22.  Contrary to Plaintiff's assertion, and as discussed more fully below, the ALJ properly evaluated the entire record and reasonably concluded that Lenarz's claim that his impairments were so severe that he could not perform *any* work was not credible.  Tr. 22.

A claimant's subjective complaints can support a disability claim as long as there is objective medical evidence of the underlying medical condition in the record. *See Jones*, 336 F.3d at 475; *see also Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 150-51 (6th Cir. 1990). "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken." *Jones*, 336 F.3d at 475 (citing 20 C.F.R. § 404.1529(c)(3)).  Where the symptoms, and not the underlying condition, form the basis of the disability claim, the ALJ uses a two-part analysis in assessing the credibility of an individual's subjective statements about his or his symptoms. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *Id.*  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones,* 336 F.3d at 476 (citations omitted). An ALJ's credibility assessment must be supported by substantial evidence but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers,* 486 F.3d at 247. If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight. *See Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); SSR 96-7p, 1996 WL 374186, *2.

In reaching his credibility determination, the ALJ considered the entire record, including inconsistencies between Lenarz's statements and the record evidence and factors that precipitate his symptoms such as noncompliance with treatment recommendations. For example, the ALJ noted that, although Lenarz testified that paramedics had been called to his home at least 20 times (Tr. 43), that number of paramedic visits was not corroborated in the medical records. Tr. 21. Further, the ALJ noted inconsistencies between Lenarz's testimony about his ability to

manage his prescription medication and his statements contained in disability reports regarding side effects stemming from his medications.  Tr. 22.   Also, while recognizing that Lenarz has suffered seizures, the ALJ determined, and the evidence supports, that Lenarz's seizures have occurred because of noncompliance with his diabetes treatment (Tr. 22, 269, 290, 298, 303) and his diabetes is under good control when he maintains a proper diet and takes his medicine as prescribed (Tr. 22, 327, 328, 336, 339, 397).  The ALJ's consideration of Lenarz's non-compliance when assessing his credibility was proper.  *See* SSR 96-7p, 1996 WL 374186, *7 (an "individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").

Contrary to Lenarz's suggestion,[14] the ALJ did consider reasons for his non-compliance. The ALJ recognized that Lenarz has had trouble managing his prescription medications and at times did not have money for treatment.  Tr. 22.  However, the ALJ discussed, and the record shows, that his family physicians enrolled him in a program where he could get his medications and test strips for free or at a low cost.  Tr. 22, 227, 229, 231, 303.   To the extent that Lenarz argues that he did not understand how to take his medicine, the record reveals that his doctors educated him on the proper methods and also enrolled him in classes to assist with medication management.  Tr. 229, 231-32, 234, 303-05.  Notwithstanding the availability of medications and the education and training he had received, Lenarz still did not consistently take his medications or follow a daily routine.[15]  Tr. 22, 227, 231, 268-69, 276, 290, 300, 303-05, 348.   Further,

---

[14] Plaintiff appears to argue that the ALJ erred in his credibility analysis by taking Plaintiff's non-compliance into account without inquiring into (1) whether Plaintiff understood the effect that failing to follow his doctor's instructions would have on his symptoms; or (2) the reasons Plaintiff failed to comply.  Doc. 14, p. 9.  This argument is not fully developed.  Thus, it is waived and is not supported by the record in any event.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[15] As an example, on January 9, 2008, Dr. Shukla, one of Lenarz's family physicians, noted that "sometimes he

Plaintiff fails to identify what other factors affected his ability to take his medication or what records support such a claim.  Finally, as shown by his own testimony, Lenarz was fully aware of the importance of complying with treatment recommendations for his diabetes.[16]  Tr. 43.

As discussed, the ALJ credited Lenarz with limitations resulting from his medically determinable impairments but also found, based on substantial evidence in the record, that the limiting effects of those impairments were not as severe as Lenarz alleged and did not preclude all work.  The ALJ reasonably concluded that Lenarz was not fully credible in alleging that he was incapable of performing any sustained work activity and the ALJ's decision is supported by substantial evidence.  The ALJ's credibility determination is therefore entitled to deference.  *See, e.g., Cross v. Commissioner of Social Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (finding that the ALJ need not analyze all seven factors identified in the regulations in assessing a claimant's credibility).

### VII.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED.**

Dated: July 11, 2013

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981);* *see also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986)*.

---

[Lenarz] totally skips meals" and he eats lard.  Tr. 228.
[16] Lenarz testified that, without checking his glucose levels, he cannot tell if his sugar is really low.  Tr. 43.  He went on to state that: "If I don't check it [blood sugar], I don't really know, and then it [a seizure] just happens." Tr. 43.